## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MICHAEL PARROTTA | : CIVIL ACTION |
|---|---|
| | : |
| v. | : NO. 18-2842 |
| | : |
| PECO ENERGY COMPANY | : |

## MEMORANDUM

**KEARNEY, J.**                                                        **January 31, 2019**

Confusion over marijuana use now reaches into whether an employee failing a drug test after admittedly self-prescribing marijuana to alleviate foot pain may argue his employer illegally retaliated by firing him after it enrolled him in an Employee Assistance Program which it treated as leave under the Family and Medical Leave Act until it could hold a disciplinary hearing on his failed drug test.     The employer's internal drug policies mandated termination for a failed drug test and warned employees the Assistance Program would not prevent later termination.     This employer decided to first place the employee in the Assistance Program for several weeks with pay and then, when he finished, hold a disciplinary hearing. Following the hearing, the employer terminated him for marijuana use as required in its internal policies. He claims, among other things, the employer fired him in retaliation for being enrolled in the Assistance Program.   But the Family and Medical Leave Act only allows a retaliation claim when the employee shows his employer retaliated against him for invoking his federal rights.     The evidence today is the employee never invoked his federal rights.     His employer automatically placed him in the Assistance Program and then, consistent with its policy, terminated him for admitted marijuana use several weeks later.   There is also no disputed fact issue as to the employee's lack of foot disability when terminated as his doctor cleared him for work over seven months earlier.  We grant the employer's motion for summary judgment in the accompanying Order.

## I.    Undisputed facts.[1]

PECO Energy Company hired Michael Parrotta as a Senior Engineer on February 23, 2015.[2]    PECO offers leave under the Family and Medical Leave Act allowing Mr. Parrotta to, among other benefits, take two weeks paid leave following the birth of his son in August 2016.[3]

### *Mr. Parrotta's foot injuries.*

On September 7, 2016, podiatrist Dr. Marc Baer told April Brockson, a PECO occupational services nurse, of his continuing treatment of Mr. Parrotta's foot condition.[4] Dr. Baer diagnosed Mr. Parrotta with a second plantar plate tear in his left foot.[5] Mr. Parrotta has always maintained his disability is a second plantar plate tear in his left foot.[6] He argues no other disability. Dr. Baer requested Ms. Brockson provide Mr. Parrotta with work restrictions as he could not climb ladders or wear fire resistant clothing due to his treatment.[7] Dr. Baer requested these restrictions for "at least 30 days from the date of [the] letter and until further notice."[8]

Following Dr. Baer's notice, Mr. Parrotta told Ms. Brockson he had Morton's Neuroma in his feet and a "Second Plantar Plate Tear" in his left foot, and he was wearing a "mid-calf rigid boot."[9] On October 14, 2016, Mr. Parrotta told Ms. Brockson of a planned October 31, 2016 surgery for his left foot and following surgery, he will require a cast and crutches for six weeks.[10]

On October 31, 2016, Ms. Brockson told PECO employees of Mr. Parrotta's approved FMLA medical leave for his surgery and recovery.[11]  On November 11, 2016, Dr. Baer told PECO Mr. Parrotta underwent "left plantar plate repair" surgery and a "left weil 2nd metatarsal osteotomy."[12] Dr. Baer wrote Mr. Parrotta "is non weight bearing, has a below the knee case and is using a walker."[13] Dr. Baer further wrote the prognosis for the plantar plate was "good" and Mr. Parrotta's pain was "well controlled with Percocet."[14] Dr. Baer also recommended Mr. Parrotta's return to "limited duty" on December 5, 2016, with "limited walking, use of cast or boot, possible

2

crutches, no stairs or ladders."[15] On December 1, 2016, Ms. Brockson told PECO's human resources representative Joseph Fenico and Mr. Parrotta's supervisor, George Leinhauser, Dr. Baer released Mr. Parrotta to light duty effective December 5 with restrictions: "limited walking, may need use of one crutch to walk with cast or boot, no stairs or ladders."[16] Mr. Leinhauser responded "[w]e can make accommodations."[17]

On January 23, 2017, Mr. Parrotta told Ms. Brockson he stopped wearing the boot.[18] Mr. Parrotta told her "[a]lthough Dr. Baer was pleased overall with the progress since surgery, he doesn't want me doing anything too rigorous, since some soreness still exists."[19]

On March 3, 2017, Mr. Parrotta told Ms. Brockson he could resume "full duty" with "only maintenance follow up with Dr. Baer."[20] On March 7, 2017, Dr. Baer wrote Mr. Parrotta's prognosis was "good" and cleared him for "full duty" on January 10, 2017 with no restrictions and no further treatment.[21] Under the medications section on the form for Mr. Parrotta's treatment plan, Dr. Baer wrote "N/A."[22] Dr. Baer did not prescribe medical marijuana. The same day, Ms. Brockson told Mr. Parrotta's new supervisor Suzanne Shaw and Mr. Fenico Mr. Parrotta could "resume his regular job duties."[23]

### *Mr. Parrotta's marijuana use leads to failed random drug test.*

On May 12, 2017, PECO Fitness for Duty Manager Emilee Avery told a PECO representative of randomly selecting Mr. Parrotta for drug testing scheduled May 15, 2017.[24] Mr. Parrotta does not dispute PECO randomly selected him for testing. On May 19, 2017, Ms. Avery reported Mr. Parrotta tested positive on the random drug testing[25] and further directed:

[Mr. Parrotta] must be removed from duty and directed to contact the Employee Assistance Program (EAP) within 24 hours to schedule a substance abuse evaluation. The evaluation will determine what assistance, education and/or treatment [Mr. Parrotta] will require to address his substance abuse. [Mr. Parrotta] is to remain off-duty until such time as the EAP has determined that the employee

3

has satisfactorily completed the recommended treatment program. My records indicate that this is Michael Parrotta's 1st positive test.[26]

On May 19, 2017, PECO's human resources representative Mr. Fenico wrote to Mr.

Parrotta confirming a positive test [27] and describes what happens next:

[The positive drug test violated] the Exelon Drug and Alcohol policy, the Standards of Conduct, and the Department of Transportation regulations.

According to those policies and regulations you are being advised you are being relieved from your duties effective immediately and are not to report to work, until advised that you are cleared to do so.

Before you report to work you must comply with the following:

Within 24 hours you must Contact the Employee Assistance Program to schedule an evaluation with a Substance Abuse Professional (SAP) and to determine what level of treatment is required. . . .

Complete the treatment program recommended by the Substance Abuse Professional (SAP).

Complete a follow-up SAP evaluation to determine if whether you have satisfactorily completed the program.

Pass a return-to-duty drug and alcohol test.

Complete a review by Occupational Health physician.

You are not permitted to return to your position until you have completed the steps outlined above. In addition, pursuant to Exelon's Drug and Alcohol Policy (HR-AC-16 Revision 0), employees are required to immediately initiate this process. Nothing in this letter is a guarantee of continued employment and you are subjected to any applicable policies including the Exelon Drug and Alcohol Policy.

Please be advised, if you do not comply with the directives outlined above by the deadline provided, we will move forward, with a recommendation for the appropriate level of discipline, up to and including termination.[28]

Exelon's Drug and Alcohol Policy provides "[f]or exempt employees, the first positive

drug test will result in termination of employment."[29] PECO classifies its senior engineers (like

Mr. Parrotta) as exempt employees.[30] Its Policy defines "drugs" as any "chemical substance whose

4

manufacture, use, possession, purchase, or sale is prohibited by law."[31] Marijuana use is prohibited by law. Under the Policy, Mr. Parrotta's positive drug test for marijuana use should automatically result in termination. But PECO did not terminate him.

The Policy provides if an employee is not terminated for his first violation, the employee "will be required to obtain and complete treatment through" an Employee Assistance Program.[32] PECO provides the Employee Assistance Program for confidential assistance for issues including drug and alcohol use.[33] PECO's Drug and Alcohol Policy provides "participation in the [Employee Assistance Program] or seeking treatment will not prevent disciplinary action, up to and including termination, for a violation of this Policy or a violation of any other applicable policy, procedure, or rule."[34] Ms. Avery explained PECO places employees on short-term disability while they complete the Employee Assistance Program, running FMLA leave concurrently with short-term disability.[35] Mr. Parrotta adduced no evidence of PECO telling employees how it internally treated his Employee Assistance Program leave as both short-term disability and FMLA leave.

## *PECO mandated FMLA leave to allow drug assistance.*

On May 19, 2017, Mr. Parrotta began the Employee Assistance Program.[36] As FMLA retaliation may only arise when the employee requests FMLA leave, the lawyers now dispute whether Mr. Parotta requested FMLA leave. Mr. Parrotta's counsel argues he requested FMLA leave and PECO approved a leave of absence beginning May 19, 2017.[37] PECO disagrees arguing the Employee Assistance Program is mandated and Mr. Parrotta never requested FMLA leave. Mr. Parrotta also disagrees with his lawyer; he swore he did not request FMLA leave to complete the Employee Assistance Program; rather, PECO assigned FMLA to him:

Q: You state or your Complaint asserts that "On May 22nd, 2017, [Mr. Parrotta] informed [PECO] that he needed FMLA leave beginning on May 22nd, 2017." Who did you inform that you needed FMLA leave?

5

A: May 22nd? I don't remember . . . .

Q: And so your contention is that you requested FMLA, so you could attend the diversion program?

A: I didn't request it. It was just—it was just a letter I got in the mail. I didn't request it. . . .

**Q: So you agree with me that it is not really accurate to say that you notified [PECO] that you needed FMLA leave; correct?**

**A: Correct. It was just assigned. It was just given.**[38]

On June 22, 2017, Mr. Fenico told Ms. Brockson and Ms. Shaw "when Mr. Parrotta is cleared to return to work, he is to return to the [Main Office Building]," not the Berwyn office.[39] PECO representative Dave Robl told him he "could return to work after [he] successfully completed the substance abuse counseling."[40] On August 2, 2017, after he completed the Employee Assistance Program, Optum Health, the third-party company running the Employee Assistance Program, recommended Mr. Parrotta "be considered for return to work."[41] Mr. Parrotta's FMLA leave ended August 12, 2017.[42]

### *PECO's fact-finding hearing on the marijuana use under its Policy.*

After his Employee Assistance Program ended, Mr. Parrotta returned to work.[43] Mr. Fenico and Ms. Shaw held a fact-finding hearing with Mr. Parrotta on August 16, 2017 regarding the positive drug test.[44] PECO alleges it conducted the fact-finding to "determine whether or not [Mr. Parrotta] had any legitimate dispute of the results of the positive random drug test."[45] Mr. Parrotta argues the purpose of the fact-finding was to determine "whether or not [he] could return to work."[46] PECO provided Mr. Parrotta notes from the hearing:

Fenico/Shaw: Are you aware of our Drug and Alcohol Policy (HR-AC-16) (Gave him a copy)
Parrotta:      Yes.

Fenico/Shaw: On Wednesday May 15th you submitted to a Random Drug and Alcohol Test and I was made aware on May 19th that you did not pass the test. Can you please explain the reason why you did not pass the test?

Parrotta: I had marijuana in my system for pain. I had left foot surgery on 10/31/2016 to shorten the tendon on my second toe. There was significant scar tissue and the wound was not healing correctly.

Fenico/Shaw: Is there anything you'd like to add?

Parrotta: I was in consultation with a Delaware doctor for medicinal certification.

Fenico/Shaw: You live in Pa. but it's not legal in Pa?

Parrotta: Correct.

Fenico/Shaw: Is this doctor prescribing or distributing it to you?

Parrotta: No. He's putting me on a list if/when it becomes legal in Pa.

Fenico/Shaw: How were you obtaining the marijuana, through your own devices?

Parrotta: On my own.[47]

The remainder of PECO's notes confirm: "At this time we are relieving you of duties pending the results of the investigation. We will be [in] contact [with] you in the next week regarding the results of the investigation. You will remain off PECO property until the company has made a decision."[48]

Mr. Fenico had "no idea" whether Mr. Parrotta would return to work after the positive drug test.[49] While it had a "zero-tolerance" Drug and Alcohol Policy, Mr. Fenico testified PECO "still had to go through a process."[50] PECO seeks a "consensus," explores "all possibilities," and holds a "fact finding" before terminating an employee for violating the Policy.[51] Mr. Fenico testified neither he nor Ms. Shaw asked Mr. Parrotta follow-up questions after he revealed he used marijuana to treat pain from his foot surgery.[52] He also testified both he and Ms. Shaw took notes during the fact finding but could not locate these notes.[53] He also testified he could not recall "anything" regarding an investigation after the fact-finding hearing.[54]

7

### *PECO fires Mr. Parrotta.*

On August 21, 2017, PECO representatives held a consensus call to discuss Mr. Parrotta's positive drug test.[55] Mr. Fenico recommended PECO fire Mr. Parrotta.[56] Following the consensus call, Mr. Fenico held an "executive termination call" on August 24, 2017 with PECO's legal counsel.[57] Mr. Fenico testified everyone on the call agreed to fire Mr. Parrotta.[58]

Ms. Krick, PECO's Vice President in Human Resources Operations, participated in the consensus call and the executive termination call.[59] She testified the PECO representatives did not discuss Mr. Parrotta's medical condition or FMLA leave during the consensus call.[60] She could not recall whether PECO representatives discussed Mr. Parrotta's medical condition during the executive call but testified they did not discuss his FMLA leave.[61] She testified PECO's legal counsel participated in the executive termination call.[62]

On August 30, 2017, Mr. Fenico wrote to Mr. Parrotta "[b]ased on your infraction of the Exelon Drug and Alcohol Policy HR-AC-16 and PECO Drug and Alcohol Policy, HR-PE-1004, your employment with the company is being terminated effective August 30, 2017."[63]

Exelon's Employee Involuntary Termination Policy states:

It is the longstanding policy and objective of this Company to comply with all applicable laws and regulations in connection with an employee involuntary termination. . . .

Before any recommendation for termination of employment receives final approval, the department's Human Resources representative will determine whether the employee has engaged in any protected activity and, if so, whether that activity might have impacted the department's recommendation for termination.[64]

### *PECO terminated other exempt employees who tested positive for marijuana.*

In the five years before firing Mr. Parrotta, PECO fired three other exempt employees after they tested positive for marijuana on their first positive tests.[65] In each case, the employee admitted

to using marijuana.[66] While PECO held a fact-finding hearing for each of these employees, only Mr. Parrotta disclosed a medical reason for using marijuana during the fact finding.[67] With these three employees, PECO terminated these employees eight, thirty-eight, and forty days after their respective drug tests.[68] Mr. Parrotta alleges PECO terminated him 107 days after his drug test. PECO retained Mr. Parrotta months longer than other employees found to have violated its zero tolerance Policy.

### *Mr. Parrotta loses job with a PECO contractor.*

On December 18, 2017, Mr. Parrotta accepted an offer of employment with Burns and McDonnell, one of PECO's major contractors.[69] Burns hired Mr. Parrotta to work on a PECO project involving the T&S Substation Control and Data Acquisition.[70]

PECO maintains a policy for rehiring "a former employee who previously received, is eligible to receive or is currently receiving benefit payments under a Retirement Plan or Savings Plan."[71] Under the Eligibility section of the policy, PECO provides "[a] former employee ...whose employment was terminated for cause or poor performance shall not be retained to work on [PECO] projects or property for a period of at least five (5) years following the termination of his/her ... employment."[72]

Burns contacted PECO about hiring Mr. Parrotta, project manager Omoro Jean-Baptiste reached out to Ms. Shaw asking if Mr. Parrotta would be a good fit for the project.[73] Ms. Shaw told Mr. Jean-Baptiste Mr. Parrotta could not work on T&S projects.[74] Mr. Jean-Baptiste relayed this information to Burns representatives.[75] Around this time, Ms. Shaw had an unrelated meeting with a Burns representative.[76] When asked about Mr. Parrotta, Ms. Shaw responded PECO would not allow Mr. Parrotta to work on its systems.[77] Burns fired Mr. Parrotta.

9

## II.    Analysis

Mr. Parrotta sues PECO alleging its termination of his employment entitles him to damages for (1) disability discrimination under the Americans with Disabilities Act (the Disabilities Act) and the Amended ADA (the Amended Act) based solely on his claim of disability based on his second left plantar plate tear in his left foot; (2) retaliation under the Disabilities Act and the Amended Act; (3) disability discrimination and retaliation under the Pennsylvania Human Rights Act; (4) retaliation under the Family and Medical Leave Act; and (5) tortious interference with business relations. PECO moves for summary judgment on all claims.[78]

### A.    We grant summary judgment for PECO on Mr. Parrotta's disability discrimination claims under the Disabilities Act and Pennsylvania law.[79]

PECO argues Mr. Parrotta fails to raise a genuine issue of fact as to whether PECO discriminated against him in violation of the Disabilities Act or Pennsylvania law. Mr. Parrotta argues genuine issues of material fact preclude summary judgment. We agree with PECO finding Mr. Parrotta's did not have a disability related to his foot condition when he suffered an adverse employment action.

### i.    We apply a burden-shifting analysis for disability discrimination claims under the Disabilities Act.

Under the Disabilities Act, Congress provides "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[80]

We apply a burden-shifting analysis to Mr. Parrotta's disability discrimination claims under the Act.[81] Under this framework, Mr. Parrotta must first establish a prima facie case for disability discrimination.[82] If he establishes a prima facie case, PECO must "articulate a legitimate,

nondiscriminatory reason for the adverse employment action."[83] If PECO does so, the burden shifts back to Mr. Parrotta to show PECO's proffered reason "is merely pretext for intentional discrimination."[84]

### ii. Mr. Parrotta fails to establish a prima facie case for disability discrimination.

PECO argues Mr. Parrotta fails establish a prima facie case because he fails to raise a genuine issue of fact as to whether he is "disabled" under the Disabilities Act at the time of the adverse employment action. To establish a prima facie case, Mr. Parrotta must show: "(1) [he] is a disabled person within the meaning of the ADA; (2) [he] is qualified to perform the essential functions of the job, with or without reasonable accommodations by [PECO]; and (3) [he] has suffered an adverse employment decision as a result of discrimination."[85] The parties only dispute whether Mr. Parrotta was "disabled" when terminated.

Mr. Parrotta argues he was "disabled" when PECO terminated him because "he suffered and continues to suffer from a condition(s) that causes pain in his left [foot]."[86] PECO argues Mr. Parrotta was not "disabled" at his termination because he "suffered from a temporary, short-term medical condition that was resolved through surgery" before termination.[87]

Congress defined "disability" in the Disabilities Act as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[88]

### a. Mr. Parrotta fails to raise a genuine issue of fact as to whether he has an "impairment that substantially limits one or more major life activities."

PECO argues Mr. Parrotta fails to establish he was disabled because he points only to his own testimony regarding his pain at the time PECO terminated him. To determine whether Mr. Parrotta is disabled under Subsection (A), we "must first identify the specific life activities that

11

[Mr. Parrotta] claims are affected and determine whether those activities are 'major life activities' under the ADA, and then must evaluate whether [Mr. Parrotta]'s impairment substantially limits those major life activities."[89] We measure disability at the time the adverse action occurred—when PECO terminated him.[90]

Under the Disabilities Act, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[91] With the Amended Disabilities Act, Congress intended courts construe the definition of "disability" "in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act."[92] The Equal Employment Opportunity Commission similarly provides the "substantially limits" analysis is "not meant to be a demanding standard."[93]

In *Mills*, the defendant argued the plaintiff was not "disabled" under the Act because she could perform daily activities and chores like driving, shopping, and caring for her daughter following a back injury.[94] The plaintiff testified although she could perform these tasks, she "struggled to complete them, and found small tasks such as brushing her daughter's hair to be painful and exhausting."[95] The court also found the plaintiff's doctor imposed restrictions on her ability to perform major life activities; these restrictions were not "self-imposed."[96] With the doctor's restrictions, the court found the plaintiff adduced sufficient evidence to raise a genuine issue of fact as to whether she was disabled.[97]

Mr. Parrotta relies upon *Hammel v. Soar Corp*[98] where Judge Restrepo found the employee established a genuine issue of material fact as to her disability at the time of the adverse employment action.[99] The plaintiff testified her back pain limited her ability to walk far distances, stand in one place for too long, lift boxes, or sit without adjustment.[100] The court also cited medical

documents showing the plaintiff received a steroid injection treatment for her back injury the day before she took a drug test and two weeks before her termination.[101] The court explained, in light of Congress' "command to construe 'disability' broadly," the plaintiff adduced sufficient—"though admittedly limited"—evidence to survive summary judgment.[102] The employee in *Hammel* offered medical evidence of a condition when terminated.

PECO argues Mr. Parrotta's case is more like *Sampson v. Methacton School District*.[103] In *Sampson*, the court found the plaintiff failed to raise a genuine issue of fact as to whether she was disabled, explaining the plaintiff failed to show her knee injury was "a permanent, long term condition."[104] The plaintiff had surgery eight months after injuring her knee. After a year recovering from surgery, the plaintiff returned to work. She occasionally wore a knee brace but could "essentially do everything that [she] used to do before [she] was injured."[105] While the plaintiff experienced some discomfort standing, walking, and sitting for long periods of time, the court explained "[m]oderate difficulties in walking or climbing stairs do not bring an individual within the class of persons protected by the ADA."[106]

PECO also relies upon *Brearey v. Brennan* where Judge Goldberg found the employee failed to raise a genuine dispute of fact as to whether he suffered from a disability under the Act.[107] The employee broke his ankle in October 2014 and told his employer he would be on crutches for six to eight weeks.[108] Medical records between October 2014 and September 2015 showed his ankle continued to heal. In September 2015, a medical professional reported the employee was "weightbearing as tolerated without restrictions."[109] Judge Goldberg found the employee's ankle injury caused only "several months of limitations, without long-term or permanent effect."[110] While the employee testified he still had ankle pain at the time of his termination, Judge Goldberg explained his "testimony that he has continued pain . . . is insufficient to establish a disability."[111]

13

Mr. Parrotta has not adduced evidence—other than his own testimony—of suffering a long-term foot disability or being disabled when terminated. The medical evidence is to the contrary. Dr. Baer diagnosed Mr. Parrotta with a second plantar plate tear in his left foot, for which Mr. Parrotta received surgery on October 31, 2016.[112] Dr. Baer cleared Mr. Parrotta on January 10, 2017 for "full duty" work, with no restrictions and no prescribed medications or additional treatments.[113]

PECO terminated Mr. Parrotta over eight months later on August 30, 2017. Mr. Parrotta testified the pain in his left foot substantially limited his ability to walk, a major life activity under the Act:

> So when I wake up in the morning, even before I put my feet on the ground, I am already in pain. It is just how the blood settles or something during the night, I'm not sure, but as soon as I put my foot down, it is going to take a while to flex and bend the toe, just so I don't have pain, just walking to the bathroom or walking down to the kitchen or something like that. So—and then, if I am sitting at a desk, working for an hour or something, or even half an hour, and I get up, the pain starts again. Every time I rest, it just—it is a buildup of like, I don't know, some sort of maybe fluid or just the scar tissue or something, but I have to keep it moving constantly just to, you know, have no pain. But if I rest, and then I start moving again, I will have pain.[114]

Mr. Parrotta testified in December 2018, over two years after his surgery, he still has pain in his foot "[t]o this day."[115] He also testified different doctors treated him for pain in his foot for three years before Dr. Baer began treating him in 2015.[116] Mr. Parrotta provides no medical documentation between January 10, 2017 and August 30, 2017 establishing an impairment causing a substantial limitation on major life activities at the time of PECO's decision to fire him.

Mr. Parrotta is like the employee in *Brearey*. Mr. Parrotta underwent surgery on October 31, 2016 and Dr. Baer imposed restrictions on Mr. Parrotta's ability to work until December 5, 2016.[117] But Dr. Baer cleared Mr. Parrotta for "full duty" work effective January 10, 2017, with

14

no restrictions, no prescribed medications, and no further treatments.[118] Mr. Parrotta's testimony he still has pain in his foot "[t]o this day" is insufficient to establish a disability.

We acknowledge Congress's mandate to construe "disabled" broadly. But Judge Restrepo, faced with "admittedly limited" evidence, still found medical documentation for the plaintiff's back pain in close temporal proximity to the plaintiff's termination. Here, we have no documentation of Mr. Parrotta's condition around the time PECO terminated him. Dr. Baer, the only treating doctor in the record, cleared Mr. Parrotta for "full duty" work without restrictions on January 10, 2017, over seven months before his termination.[119]

Unlike the employee in *Mills*, Mr. Parrotta's alleged limitations on his ability to walk at the time of his termination were "self-imposed." To show disability measured from the time of the adverse action, Mr. Parrotta relies only on his own testimony his left foot caused him pain when walking. As explained, pain alone is insufficient to establish a substantial limitation on a major life activity.[120] But importantly, a plaintiff cannot establish disability relying solely on his own testimony without any medical documentation of his impairment at the time of the adverse action. Such self-diagnosing testimony alone fails to clear the even the low hurdle for establishing a disability in *Hammel*. If we allow an employee to establish a disability relying solely on his own testimony, there would be no reasonable limit to a "disability" under the Disabilities Act. Mr. Parrotta fails to raise a genuine issue of fact as to whether he has an "impairment that substantially limits one or more major life activities" when PECO fired him.

> **b.      Mr. Parrotta fails to raise a genuine issue of fact as to whether he had a record of impairment.**

PECO argues Mr. Parrotta cannot show a record of impairment as his surgery, recovery time, and work restrictions for his foot condition total approximately two months. Mr. Parrotta

argues his record of impairment dates back three years before his surgery and continues to this day.

To establish a record of impairment under Section 12102(1)(B), Mr. Parrotta must show a "history of, or [had] been misclassified as having, an impairment that substantially limited a major life activity."[121] Mr. Parrotta must also show PECO relied upon his record of impairment when it terminated him.[122]

Our Court of Appeals determined a "relatively short-term absence from work, without any long-term impairment, is generally held to be insufficient to create a record of disability."[123] In *Eshelman*, the court explained the plaintiff's six-month absence from work for cancer treatment, without a showing of long-term impairment, was insufficient to create a record of impairment.[124]

To establish a record of impairment, Mr. Parrotta argues his physical impairment "dates back approximately three years prior to his October 31, 2016 surgery and continues to this day."[125] But Mr. Parrotta must show a record of an impairment substantially limiting a major life activity. As explained, Mr. Parrotta failed to show he had an impairment substantially limiting a major life function between January 10, 2017 when Dr. Baer cleared him for "full duty" work on and August 30, 2017 when PECO terminated him. While he argues an impairment dating three year before his surgery, he offers no evidence of substantial limitations on a major life activity during this time.

On September 7, 2016, Dr. Baer requested work restrictions for Mr. Parrotta: no climbing ladders and no wearing fire resistant clothing.[126] Mr. Parrotta underwent surgery on October 31, 2016 and returned to "limited duty" work on December 5, 2016.[127] Dr. Baer cleared Mr. Parrotta for "full duty" work on January 10, 2017.[128] Even accepting Mr. Parrotta suffered from an impairment substantially limiting a major life activity between September 2016 and January 2017, the time period is too short to establish a record of impairment.[129] Mr. Parrotta also points to no

evidence PECO relied upon his alleged record of impairment in terminating him. Mr. Parrotta fails to raise a genuine issue of fact as to whether he had a record of impairment.

### c. Mr. Parrotta fails to raise a genuine issue of fact as to whether PECO regarded him as disabled.

Mr. Parrotta alleges he had an impairment and PECO and his supervisors were aware of his impairment. PECO argues no PECO representative regarded Mr. Parrotta as disabled.

Mr. Parrotta is "regarded" as having an impairment under Section 12102(1)(C) if PECO "subjected [him] to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity."[130] "[T]he mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action."[131]

In *Gavurnik*, the plaintiff was hospitalized for chest pains and later requested a note clearing him for return to work. Judge Schiller found the plaintiff's evidence only showed the employer's awareness of his chest pains and thus insufficient to establish the "regarded as" prong.[132] The plaintiff provided no evidence the employer remarked on his condition to show the employer "regarded" the plaintiff as disabled.[133]

Mr. Parrotta similarly adduces no evidence PECO regarded him as having an impairment. In his report to PECO, Dr. Baer cleared Mr. Parrotta for "full duty" work effective January 10, 2017, with no restrictions, no prescribed medications, and no further treatment. No reasonable fact-finder would believe PECO regarded Mr. Parrotta as having an impairment when it terminated him after Dr. Baer cleared Mr. Parrotta for full duty without restrictions seven months before it terminated him. While Mr. Parrotta told Mr. Fenico and Ms. Shaw at the August 16, 2017 fact-finding he took marijuana to treat the pain in his foot, an employer's awareness of an employee's

pain is not enough to establish the "regarded as" prong.[134]  Mr. Parrotta fails to raise a genuine issue of fact as to whether PECO regarded him as having an impairment.

As Mr. Parrotta fails to show he was "disabled" under the Act, he fails to establish a prima facie case for disability discrimination. Even assuming we found a prima facie case for disability discrimination, we also find no evidence creating genuine issues of material fact precluding summary judgment in PECO's favor.

### iii. PECO articulates a legitimate, nondiscriminatory reason for terminating Mr. Parrotta.

Upon showing a prima facie case, the burden shifts to PECO to proffer a legitimate, nondiscriminatory reason for terminating Mr. Parrotta. PECO proffers a reason: "At all times, [PECO] made clear that [Mr. Parrotta] was terminated based on his first verified positive drug test, which, for exempt employees called for termination under [PECO]'s policies."[135] Mr. Parrotta does not dispute this contention. We find PECO proffers a legitimate, nondiscriminatory reason for terminating Mr. Parrotta.

### iv. Mr. Parrotta fails to show pretext.

Since PECO articulates a legitimate, nondiscriminatory reason for terminating him, Mr. Parrotta must show the proffered reason is pretextual. Mr. Parrotta offers two reasons for pretext: (1) because PECO maintained a "zero-tolerance" Drug and Alcohol policy, PECO would have terminated him immediately following his positive drug test rather than waiting 107 days to terminate him; and, (2) PECO terminated three other exempt employees for a first-time positive drug test for marijuana "in a very short period of time" compared to Mr. Parrotta's termination.[136] PECO argues Mr. Parrotta fails to adduce evidence from which a reasonable factfinder could find discrimination was "more likely than not" the reason for termination. PECO further argues because

18

it terminated the three other exempt employees, Mr. Parrotta fails to show PECO treated similarly-situated employees more favorably.[137]

To show pretext, Mr. Parrotta must offer evidence "from which a factfinder could reasonably either (1) disbelieve [PECO's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of [PECO's] action."[138]

Under the first option, Mr. Parrotta must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [PECO's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that [PECO] did not act for [the asserted] non-discriminatory reasons.'"[139] To discredit PECO's reason, Mr. Parrotta "must show, not merely that [PECO]'s proffered reason was wrong, but that it was so plainly wrong that it cannot have been [PECO]'s real reason."[140] "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."[141]

Under the second option, Mr. Parrotta must offer evidence showing "(1) [he] has previously been discriminated against by [PECO]; (2) [PECO] has discriminated against other persons with disabilities; or (3) [PECO] has treated similarly situated persons without a disability more favorably."[142]

### a.     Mr. Parrotta fails to offer evidence discrediting PECO's proffered reason for terminating him.

Mr. Parrotta argues although PECO contends in maintained a "zero-tolerance" Drug and Alcohol policy, it terminated him 107 days after his positive drug test. Because of the delay—and Exelon's Drug and Alcohol Policy allowing for management's discretion concerning termination—PECO's proffered reason for termination suffers from "too many weaknesses,

implausibilities, inconsistencies, incoherencies, and contradictions" and thus suggests PECO terminated him because of his alleged disability.[143]

Mr. Parrotta acknowledges while Exelon's Drug and Alcohol Policy provides "[f]or exempt employees, the first positive drug test will result in termination of employment,"[144] elsewhere the Policy provides "[e]mployees who violate this Policy are subject to discipline, up to and including immediate termination of employment, as determined in management's discretion."[145] After his positive drug on May 15, 2017, PECO did not immediately terminate him. Instead, on May 19, Mr. Fenico wrote to Mr. Parrotta:

[The confirmed positive test] represented a violation of the Exelon Drug and Alcohol policy, the Standards of Conduct, and the Department of Transportation regulations.

According to those policies and regulations you are being advised you are being relieved from your duties effective immediately and are not to report to work, until advised that you are cleared to do so.

Before you report to work you must comply with the following:

Within 24 hours you must Contact the Employee Assistance Program to schedule an evaluation with a Substance Abuse Professional (SAP) and to determine what level of treatment is required. . . .

Complete the treatment program recommended by the Substance Abuse Professional (SAP).

Complete a follow-up SAP evaluation to determine if whether you have satisfactorily completed the program.

Pass a return-to-duty drug and alcohol test.

Complete a review by Occupational Health physician.

You are not permitted to return to your position until you have completed the steps outlined above. In addition, pursuant to Exelon's Drug and Alcohol Policy (HR-AC-16 Revision 0), employees are required to immediately initiate this process. Nothing in this letter is a guarantee of continued employment and you are subjected to any applicable policies including the Exelon Drug and Alcohol Policy.

> Please be advised, if you do not comply with the directives outlined above by the deadline provided, we will move forward, with a recommendation for the appropriate level of discipline, up to and including termination.[146]

On June 22, 2017, Mr. Fenico told Ms. Brockson and Ms. Shaw "when Mr. Parrotta is cleared to return to work, he is to return to the [Main Office Building]," not the Berwyn office.[147] Mr. Fenico testified he had "no idea" whether Mr. Parrotta would return to work following the failed drug test.[148] Mr. Fenico further testified while PECO had a "zero-tolerance" policy, it "still had to go through a process."[149] When asked if Mr. Parrotta could return to work following the positive drug test, Mr. Fenico testified PECO uses a "consensus," explores "all possibilities," and holds a "fact finding."[150] During the fact finding, Mr. Fenico and Ms. Shaw did not ask any follow-up questions after he informed them he used marijuana to relieve pain in his left foot following surgery.[151] Mr. Parrotta argues although PECO told him on August 16, 2017 following the fact-finding hearing it was "relieving [him] of his duties pending the results of an investigation,"[152] PECO did not further investigate.[153] Mr. Fenico recommended termination during the August 21, 2017 consensus call.[154]

Mr. Parrotta testified PECO representative Dave Robl told him he "could return to work after [he] successfully completed the substance abuse counseling."[155] During a consensus call with PECO representatives following the fact-finding hearing, Mr. Fenico testified he could not remember anything said the consensus call.[156] Ms. Krick testified PECO representatives, including PECO's legal counsel, did not discuss Mr. Parrotta's medical condition or FMLA leave during the executive termination call or the consensus call.[157] Mr. Parrotta argues "it is simply not credible that a team of long-time human resources professionals coupled with counsel would not discuss" his medical condition or FMLA leave before terminating him.[158] Mr. Parrotta also argues PECO failed to adhere to its "Employee Involuntary Termination Process."[159]

21

Mr. Parrotta fails to offer evidence showing PECO's proffered reason suffers weaknesses or inconsistencies making it "unworthy of credence." Mr. Parrotta, an exempt employee, tested positive for marijuana and PECO terminated him after the positive test. Mr. Parrotta admitted to PECO representatives he used an illegal drug. PECO provides in its Drug and Alcohol Policy "[f]or exempt employees, the first positive drug test will result in termination."[160]

The fact PECO waited 107 days before terminating him does not make PECO's reason unbelievable, nor does it suggest PECO fired him because of his alleged disability. As Mr. Parrotta admits, PECO must still "go through a process" before terminating employees for positive drug tests. The process involves the Employee Assistance Program, a fact-finding hearing, a consensus call, and an executive termination call. While he argues PECO representatives told him or suggested he could return to work after completing the Employee Assistance Program, PECO ultimately terminated him. The Drug and Alcohol Policy provides "participation in the [Employee Assistance Program] or seeking treatment will not prevent disciplinary action, up to and including termination, for a violation of this Policy[.]"[161] Mr. Fenico advised Mr. Parrotta completion of the program was not a "guarantee of continued employment."[162] Mr. Parrotta does not suggest anyone told him PECO would not terminate him for a positive drug test. PECO importantly never changed its reason for terminating Mr. Parrotta. Nor does Mr. Parrotta's evidence suggest PECO terminated him for his alleged disability.[163]

Mr. Parrotta seems to argue because the Drug and Alcohol Policy allowed for PECO's discretion to terminate him for a positive drug test or it otherwise failed to automatically fire him as exempt employee with a positive drug test, a factfinder could infer a discriminatory motive. We cannot agree. Mr. Parrotta must offer evidence showing a factfinder would rationally disbelieve PECO terminated him for violating the Drug and Alcohol Policy. Merely pointing to a

22

discretionary policy does not undermine the proffered reason.[164] If Mr. Parrotta showed PECO used its discretion to treat employees without a disability more favorably, he could raise an issue of fact concerning whether PECO's reason was pretextual since such evidence shows a discriminatory motive.[165] But he fails to do so.

Mr. Parrotta points to alleged deficiencies in, and witnesses' inability to recall details from, the fact-finding and consensus call, including (1) Mr. Fenico and Ms. Shaw's failure to ask follow-up questions during, or locate their notes from, the fact-finding hearing; (2) the failure to discuss Mr. Parrotta's medical condition and FMLA leave during the consensus call and executive termination call; and (3) the failure to determine whether Mr. Parrotta engaged in protected activity in violation of its termination policy.

This evidence does not render PECO's reasons "unworthy of credence." We do not inquire whether PECO "conducted a comprehensive investigation or whether they made a wise or prudent decision," but "whether [PECO's] decision was motivated by discriminatory animus."[166] Mr. Parrotta's evidence does not suggest PECO terminated him because of the disability he alleges—the second plantar plate tear in his left foot. Mr. Parrotta does not show discriminatory animus based on his disability; at the time of his termination, PECO had no reason to believe Mr. Parrotta was disabled when his treating doctor cleared him for "full duty" with no restrictions, no prescribed medications, and no further treatment more than seven months before his termination.

Mr. Parrotta admits he tested positive for an illegal drug and no medical professional prescribed the drug. Mr. Parrotta also admits PECO's Drug and Alcohol Policy provides "[f]or exempt employees, the first positive drug test will result in termination of employment."[167] While he points to deficiencies in the fact-finding hearing, consensus call, and the termination call, such deficiencies do not establish pretext.[168] No reasonable fact-finder would disbelieve PECO

23

terminated Mr. Parrotta for a positive drug test because of these deficiencies. Most importantly, these deficiencies fail to show PECO terminated him because of his alleged disability. Such evidence does not render PECO's reason for termination "so plainly wrong that it cannot have been [PECO]'s real reason."[169]

### b. Mr. Parrotta fails to show PECO treated similarly-situated employees more favorably than him.

To show disability discrimination was "more likely than not" the reason for his termination, Mr. Parrotta argues PECO treated similarly-situated employees without a disability more favorably than it treated him. Mr. Parrotta argues "three other exempt employees who [PECO] terminated for positive drug tests (none of who presented medical explanations during their fact findings) were all terminated in a very short time period."[170] While PECO terminated Mr. Parrotta 107 days after his positive drug test, PECO terminated these three comparator employees eight, thirty-eight, and forty days after their respective positive drug tests.[171]

Mr. Parrotta's argument misses the mark. Mr. Parrotta must show PECO treated similarly-situated employees **more favorably** than it treated him. PECO terminated these three exempt employees following their first positive drug tests for marijuana; in other words, PECO treated Mr. Parrotta **the same** as it treated these three employees. Although PECO terminated these employees sooner after their positive tests, we fail to see how such evidence proves PECO treated these employees more favorably. In fact, as PECO approved Mr. Parrotta for paid leave following the drug test,[172] PECO likely treated Mr. Parrotta more favorably than the comparator employees.

We are not reviewing a situation where an employer terminated an employee for using a legitimate, lawful drug. In such a case, the plaintiff may be able to claim discrimination. Mr. Parrotta used an illegal drug without a prescription from a medical professional and PECO terminated him under its Drug and Alcohol Policy. While PECO employed Mr. Parrotta longer

24

than the three comparator employees following their respective positive drug tests, this does not show PECO treated the other employees more favorably. Mr. Parrotta points to deficiencies in the termination process, but such evidence does not suggest PECO's reason for termination was "plainly wrong."

Mr. Parrotta fails to raise an issue of fact as to whether PECO's proffered reason for terminating him is pretextual. We grant PECO summary judgment on Mr. Parrotta's disability discrimination claims under the Disabilities Act and Pennsylvania law.

## B.    We grant PECO summary judgment on Mr. Parrotta's retaliation claims under the Disabilities Act and Pennsylvania law.[173]

Under the retaliation provision in the Disabilities Act, Congress provides "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."[174] For a retaliation claim under the Disabilities Act, we use the same burden-shifting framework as a disability discrimination claim.[175]

To establish a prima facie case for retaliation under the Disabilities Act, Mr. Parrotta must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."[176]

PECO concedes Mr. Parrotta engaged in protected activity when he requested disability leave and light work duty. PECO only argues Mr. Parrotta fails to show a causal connection between the protected activity and his termination. "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the

25

protected activity and the allegedly retaliatory action, or (2) an intervening pattern of antagonism [or other evidence of retaliatory animus] coupled with timing to establish a causal link."[177]

In his response, Mr. Parrotta argues a causal connection because PECO terminated him shortly after his return from FMLA leave ending on August 12, 2017. But Mr. Parrotta did not request FMLA leave in this instance; PECO placed him on paid FMLA leave to complete the Employee Assistance Program following his positive drug test.[178] This leave may be relevant to his FMLA retaliation claim but not his claim under the Disabilities Act and Pennsylvania law.

Mr. Parrotta alleges three requests for disability accommodations: (1) for light duty in September 2016 prior to his October 31, 2016 surgery; (2) for medical leave for his surgery and post-surgery recovery; and, (3) for light duty work after he returned to work in December 2016.[179] PECO terminated Mr. Parrotta on August 30, 2017. Our Court of Appeals held two months between the protected activity and the adverse action is not "unusually suggestive temporal proximity."[180] As his most recent protected activity under the Act occurred more than eight months before his termination, Mr. Parrotta fails to show an unusually suggestive temporal proximity between his protected activity and his termination. Mr. Parrotta does not argue an intervening pattern of antagonism. Mr. Parrotta fails to establish a genuine issue of fact as to a causal connection between the alleged protected activity and his termination.

Even if Mr. Parrotta could establish a prima facie case for retaliation, he fails to raise a genuine dispute of material fact showing PECO's reason for termination is pretext. We apply the same burden-shifting framework to retaliation claims under the Disabilities Act. As explained, Mr. Parrotta failed show PECO's legitimate, nondiscriminatory reason for his termination was pretextual. The parties incorporated their arguments from Mr. Parrotta's disability discrimination claim concerning legitimate, nondiscriminatory reason and pretext into their arguments for the

retaliation claims. We grant PECO summary judgment on Mr. Parrotta's retaliation claims under the Disabilities Act and Pennsylvania law.

## C. We grant PECO summary judgment on Mr. Parrotta's FMLA retaliation claim.

Mr. Parrotta argues PECO terminated him because he took FMLA leave. PECO argues Mr. Parrotta fails to establish a prima facie case for retaliation and, even assuming he does, he fails to show PECO's proffered reason for terminating him was pretextual.

The Department of Labor provides "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions[.]"[181] As Mr. Parrotta alleges PECO terminated him for taking FMLA leave, we interpret his claim as a retaliation claim under the FMLA.

We apply the burden-shifting framework to Mr. Parrotta's retaliation claim under the FMLA.[182] To establish a prima facie case for FMLA retaliation, Mr. Parrotta must establish "(1) [he] invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights."[183] "To invoke rights under the FMLA, employees must provide adequate notice to their employer about their need to take leave."[184]

The difficult issue before us is whether Mr. Parrotta invoked his right to the FMLA leave or PECO assigned him to the Employee Assistance Program and internally treated the leave as a FMLA leave. Do you need to ask for FMLA leave to sue for FMLA retaliation?

Before *Erdman*, our Court of Appeals described the first element of a prima facie case as whether the employee "**took** an FMLA leave."[185] In *Erdman*, the employer argued the plaintiff failed to establish a prima facie FMLA retaliation claim because the employer terminated the plaintiff after she requested FMLA leave but before she took the leave.[186] The court explained the

27

absurd consequence if an employer could escape a retaliation claim by firing an employee before her FMLA leave commenced.[187] Thus, the court read the first element of the retaliation claim as requiring only an "invocation of FMLA rights."[188]

Mr. Parrotta alleges three FMLA leaves of absence during his employment with PECO: (1) a two-week parental leave beginning August 24, 2016 following the birth of his child; (2) an FMLA medical leave from October 31, 2016 to December 5, 2016 for surgery and post-surgery recovery; and, (3) an FMLA leave from May 19, 2017 to August 12, 2017 to complete the Employee Assistance Program following his positive drug test.

### i. Mr. Parrotta fails to establish a prima facie case for FMLA retaliation for his August 24, 2016 FMLA leave.

PECO argues Mr. Parrotta fails to show a causal connection between his August 24, 2016 FMLA request and his termination. We agree.

Mr. Parrotta can show causal connection with (1) an "unusually suggestive" temporal proximity between the protected activity and the adverse action or (2) evidence of a "pattern of antagonism in the intervening period."[189]

Mr. Parrotta requested, and PECO granted, a two-week FMLA leave of absence on August 24, 2016 for the birth of his son. PECO terminated Mr. Parrotta on August 30, 2017. Mr. Parrotta fails to establish an "unduly suggestive" temporal proximity between his FMLA leave request and his termination.[190] Because Mr. Parrotta does not argue a pattern of antagonism in the intervening period, Mr. Parrotta fails to establish a causal connection and thus fails to establish a prima facie case for FMLA retaliation stemming from his August 24, 2016 FMLA leave.

### ii. Mr. Parrotta fails to establish a prima facie case for FMLA retaliation for FMLA leave from October 31, 2016 to December 5, 2016.

Mr. Parrotta requested, and PECO granted, an FMLA medical leave from October 31, 2016 to December 5, 2016 for his surgery on his left foot and post-surgery recovery. PECO terminated Mr. Parrotta on August 30, 2017. Mr. Parrotta fails to show an "unusually suggestive" temporal proximity between his request for leave and his termination.[191] As he does not argue a pattern of antagonism, he fails to establish a causal connection and thus fails to establish a prima facie case for FMLA retaliation for his October 31, 2016 to December 5, 2016 FMLA leave.

### iii. Mr. Parrotta fails to establish a prima facie case for FMLA retaliation for his FMLA leave from May 19, 2017 to August 12, 2017.

Mr. Parrotta argues PECO retaliated against him by terminating shortly after he returned from his second FMLA leave on August 12, 2017. PECO argues Mr. Parrotta cannot establish a prima facie case because he did not invoke his rights under the FMLA.

Mr. Parrotta cites his lawyer's Rule 26 Report to show he invoked his rights: "On May 23, 2017, [PECO]'s FMLA Coordinator informed [Mr. Parrotta] that [he] was eligible for FMLA leave and that [PECO] had approved [his] FMLA leave **request**, beginning on May 19, 2017."[192] But PECO cites Mr. Parrotta's own deposition showing he did not request FMLA leave:

> Q: You state or your Complaint asserts that "On May 22nd, 2017, [Mr. Parrotta] informed [PECO] that he needed FMLA leave beginning on May 22nd, 2017." Who did you inform that you needed FMLA leave?
>
> A: May 22nd? I don't remember . . . .
>
> Q: And so your contention is that you requested FMLA, so you could attend the diversion program?
>
> A: I didn't request it. It was just—it was just a letter I got in the mail. I didn't request it. . . .
>
> Q: So you agree with me that it is not really accurate to say that you notified [PECO] that you needed FMLA leave; correct?

A: Correct. It was just assigned. It was just given.[193]

Regardless of his lawyer's position in a Rule 26 Report, Mr. Parrotta admitted under oath he did not request FMLA leave; rather PECO assigned him to the Employee Assistance Program and internally treated him as subject to FMLA leave to complete the Employee Assistance Program.

We recognize the apparent facial unfairness; one might argue PECO places Mr. Parrotta on leave to participate in the Employee Assistance Program so he does not invoke his FMLA rights and thus cannot sue when he is fired shortly after his FMLA leave for the conduct leading to the Employee Assistance Program. But this facial inequity fades when PECO's Policy reminded Mr. Parrotta the Employee Assistance Program did not affect a later finding leading to termination. Mr. Parrotta neither invoked his federal rights nor knew of his FMLA protections as there is no evidence PECO told Mr. Parrotta of the FMLA internal treatment. Mr. Parrotta admitted using an illegal marijuana drug as a Senior Engineer. PECO provided him with an Employee Assistance Program to address his marijuana use. It did not guarantee his job after completing the Employee Assistance Program. Another alternative would be PECO firing Mr. Parrotta for the marijuana use as required under its Policy and not providing him with the Employee Assistance Program while being paid. Federal law, including the FMLA, does not allow a retaliation claim when Mr. Parrotta fails to establish he invoked his rights under the FMLA. It is incongruous to argue an employer retaliates against an employee for taking FMLA leave when the employer puts the employee on leave and there is no evidence the employee knows he is on FMLA leave. He just knows he is getting paid while participating in the Employee Assistance Program. He thus fails to establish a prima facie case for FMLA retaliation.

We grant PECO summary judgment on Mr. Parrotta's FMLA retaliation claims.

**D.    We dismiss Mr. Parrotta's tortious interference claim for lack of subject matter jurisdiction.**

PECO argues Mr. Parrotta fails to establish a claim for tortious interference as a matter of law. Mr. Parrotta argues PECO had no justification for interfering with his new employment with Burns because its "Rehiring Retirees" policy applies only to "retirees" and Mr. Parrotta was not a "retiree."[194]

As we grant summary judgment to PECO on Mr. Parrotta's federal claims, we decline jurisdiction on his state law claim. When "all federal claims are eliminated before trial, a federal court should normally hesitate to exercise jurisdiction unless considerations of judicial economy, convenience, and fairness to litigants counsel otherwise."[195] In *Bloom*, Judge McHugh declined jurisdiction over the plaintiff's state law claims after granting summary judgment for the defendant on the plaintiff's federal claim.[196] Here, we are similarly at the summary judgment stage. The parties are not diverse as they are both citizens of Pennsylvania.[197] The parties may be able to use the discovery from this case in state court. We dismiss Mr. Parrotta's state law claim for tortious interference without prejudice to Mr. Parrotta bringing this claim in state court.

**III.    Conclusion.**

In an accompanying Order, we grant PECO summary judgment on Mr. Parrotta's claims for (1) disability discrimination under the Americans with Disabilities Act and the Pennsylvania Human Relations Act, (2) retaliation under the Disabilities Act and the Pennsylvania Human Relations Act, and (3) retaliation under the FMLA. We dismiss without prejudice Mr. Parrotta's claim for tortious interference with business relations under Pennsylvania law for lack of subject matter jurisdiction.

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. PECO filed its SUMF ("PECO SUMF") at ECF Doc. No. 17 and its appendix at ECF Doc. No. 18. PECO filed its brief in support of the Motion at ECF Doc. No. 19. Mr. Parrotta filed his opposition brief at ECF Doc. No. 20, his response SUMF ("Parrotta SUMF") at ECF Doc. No. 20-1, and his supplement to PECO's appendix at ECF Doc. No. 20-2.

[2] ECF Doc. No. 17 (PECO SUMF) ¶ 25. PECO is an indirect subsidiary of Exelon Corporation. *Id.* ¶ 1.

[3] ECF Doc. No. 17 (PECO SUMF) ¶ 26; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 26.

[4] ECF Doc. No. 17 (PECO SUMF) ¶ 27; ECF Doc. No. 18 (App. DMSJ) at 46.

[5] ECF Doc. No. 18 (App. DMSJ) at 54.

[6] Mr. Parrotta's Complaint (ECF Doc. No. 1) ¶ 16; Mr. Parrotta's Brief in Opposition to PECO's Motion for Summary Judgment (ECF Doc. No. 20), at p. 6.

[7] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 27.

[8] *Id.*

[9] *Id.*; ECF Doc. No. 18 (App. DMSJ) at 46.

[10] ECF Doc. No. 17 (PECO SUMF) ¶ 30; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 30.

[11] ECF Doc. No. 17 (PECO SUMF) ¶ 31; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 31.

[12] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 33.

[13] *Id.* at ¶ 34.

[14] ECF Doc. No. 17 (PECO SUMF) ¶¶ 33-34.

[15] *Id.* at ¶ 35.

[16] *Id.* at ¶ 36; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 36.

[17] ECF Doc. No. 17 (PECO SUMF) ¶ 36; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 36.

[18] ECF Doc. No. 17 (PECO SUMF) ¶ 37; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 37.

[19] ECF Doc. No. 17 (PECO SUMF) ¶ 37; ECF Doc. No. 18 (App. DMSJ) at 57.

[20] ECF Doc. No. 17 (PECO SUMF) ¶ 38.

[21] *Id.* at ¶ 40.

[22] *Id.*

[23] *Id.* at ¶ 41.

[24] *Id.* at ¶ 42; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 42.

[25] ECF Doc. No. 17 (PECO SUMF) ¶ 51.

[26] *Id.* at ¶ 52.

[27] ECF Doc. No. 18 (App. DMSJ) at 97.

[28] *Id.*

[29] ECF Doc. No. 17 (PECO SUMF) ¶ 12.

[30] *Id.* at ¶ 4.

[31] ECF Doc. No. 18 (App. DMSJ) at 10.

[32] ECF Doc. No. 18 (APP. DMSJ) at 11.

[33] ECF Doc. No. 18 (App. DMSJ) at 10.

[34] *Id.*

[35] ECF Doc. No. 17 (PECO SUMF) ¶ 57; ECF Doc. No. 18 (App. DMSJ) at 33.

[36] ECF Doc. No. 17 (PECO SUMF) ¶ 57; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 57.

[37] ECF Doc. No. 9 (Rule 26 Report, Stipulated Facts), at p. 3 ¶ 2.f.

[38] ECF Doc. No. 18 (App. DMSJ) at 257-61.

[39] ECF Doc. No. 20-2 (App. DMSJ) at 295.

[40] *Id.* at 282.

[41] ECF Doc. No. 18 (App. DMSJ) at 107.

[42] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 118.

[43] ECF Doc. No. 17 (PECO SUMF) ¶ 58; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 58; ECF Doc. No. 20, at p. 2.

[44] ECF Doc. No. 17 (PECO SUMF) ¶ 59.

[45] *Id.*

[46] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 59.

[47] ECF Doc. No. 18 (App. DMSJ) at 110.

[48] *Id.* at 111.

[49] ECF Doc. No. 20-2 (App. DMSJ) at 294.

[50] *Id.*

[51] *Id.*

[52] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 127.

[53] *Id.* at ¶ 124.

[54] *Id.* at ¶ 60.

[55] ECF Doc. No. 17 (PECO SUMF) ¶ 66.

[56] ECF Doc. No. 20-2 (App. DMSJ) at 300-01.

[57] ECF Doc. No. 17 (PECO SUMF) ¶ 69.

[58] ECF Doc. No. 18 (App. DMSJ) at 128-32.

[59] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 143.

[60] *Id.* at ¶ 148.

[61] *Id.* at ¶ 154.

[62] *Id.* at ¶ 152.

[63] ECF Doc. No. 17 (PECO SUMF) ¶ 72; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 72.

[64] ECF Doc. No. 18 (App. DMSJ) at 197, 199.

[65] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 74.

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] ECF Doc. No. 17 (PECO SUMF) ¶ 85.

[70] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 86; ECF Doc. No. 17 (PECO SUMF) ¶ 88.

[71] ECF Doc. No. 20-2 (App. DMSJ) at 340.

[72] ECF Doc. No. 18 (App. DMSJ) at 208.

[73] ECF Doc. No. 17 (PECO SUMF) ¶ 90.

[74] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 91.

[75] *Id.* at ¶ 92.

[76] ECF Doc. No. 17 (PECO SUMF) ¶ 94.

[77] *Id.* at ¶ 94.

[78] Summary judgment is proper when "the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that could affect the outcome' of the proceeding, and 'a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011)). On a motion for summary judgment, "we view the facts and draw all reasonable inferences in the light most favorable to the nonmovant." *Pearson*, 850 F.3d at 533-34 (3d Cir. 2017) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)). "The party seeking summary judgment 'has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact.'" *Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015)). If the movant carries its burden, "the nonmoving party must identify facts in the record that would enable them to make a sufficient showing on essential elements of their case for which they have the burden of proof." *Willis*, 808 F.3d at 643 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If, after adequate time for discovery, the nonmoving party has not met its burden, pursuant to Federal Rule of Civil Procedure 56, the court must enter summary judgment against the nonmoving party." *Willis*, 808 F.3d at 643 (citing *Celotex Corp.*, 477 U.S. at 322-23).

[79] As courts use the same analysis for disability discrimination claims under the Act and claims under Pennsylvania law, our holding for Mr. Parrotta's disability discrimination claim under the Act applies equally to his Pennsylvania law claim. *See Bialko v. Quaker Oats Co.*, 434 F. App'x

139, 142 (3d Cir. 2011) ("The analytical framework used to evaluate a disability discrimination claim under the PHRA is effectively indistinguishable from that under the ADA, thus allowing courts to dispose of both ADA and PHRA claims on the same grounds.").

[80] 42 U.S.C. § 12112(a).

[81] *Sampson v. Methacton Sch. Dist.*, 88 F. Supp. 3d 422, 434 (E.D. Pa. 2015) (*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)).

[82] *Decker v. Alliant Techs., LLC*, 871 F. Supp. 2d 413, 425 (E.D. Pa. 2012) (citing *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000)).

[83] *Id.* (citing *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998)).

[84] *Id.* (citing *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008)).

[85] *Garrow v. Wells Fargo Bank, N.A.*, No. 15-1468, 2016 WL 5870858, at *8 (E.D. Pa. Oct. 7, 2016) (citing *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998)).

[86] ECF Doc. No. 20, at p. 6.

[87] ECF Doc. No. 19, at p. 8.

[88] 42 U.S.C. § 12102(1).

[89] *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 620 (E.D. Pa. 2012) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306-07 (3d Cir. 1999)).

[90] *Id.* at 621 (citing *Bowers v. NCAA*, 475 F.3d 524, 535-36 (3d Cir. 2007)).

[91] 42 U.S.C. § 12102(2)(A).

[92] *Mills*, 869 F. Supp. 2d at 620 (quoting Pub. L. No. 110–325, §§ 2(b)(1)-(6), 3(2)(a), 4(a), 122 Stat. 3553, 3555).

[93] 29 C.F.R. § 1630.2(j)(1)(i).

[94] *Mills*, 869 F. Supp. 2d at 621.

[95] *Id.*

[96] *Id.* at 622.

[97] *Id.*

[98] No. 14-3106, 2015 WL 505410 (E.D. Pa. Feb. 6, 2015).

[99] *Hammel*, 2015 WL 505410, at *3.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] 88 F. Supp. 3d 422 (E.D. Pa. 2015).

[104] *Sampson*, 88 F. Supp. 3d at 437.

[105] *Id.*

[106] *Id.*

[107] No. 17-2108, 2019 WL 111037 (E.D. Pa. Jan. 4, 2019).

[108] *Brearey*, 2019 WL 111037, at *2.

[109] *Id.* at *6.

[110] *Id.*

[111] *Id.*

[112] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 99.

[113] ECF Doc. No. 18 (App. DMSJ) at 49.

[114] ECF Doc. No. 20-2 (App. DMSJ) at 277.

[115] *Id.* at 285.

[116] ECF Doc. No. 18 (App. DMSJ) at 226-28.

[117] *Id.* at 54.

[118] *Id.* at 49.

[119] ECF Doc. No. 20-2 (App. DMSJ) at 329.

[120] *Provence v. Avon Grove Charter Sch.*, No. 07-659, 2008 WL 2928314, at *8 (E.D. Pa. July 28, 2008); *see also Brearey*, 2019 WL 111037, at *6 ("Plaintiff's testimony that he has continued pain . . . is insufficient to establish a disability."); *Sampson*, 88 F. Supp. at 437 ("Moderate difficulties

in walking or climbing stairs do not bring an individual within the class of persons protected by the ADA.").

[121] *Eshelman v. Agere Sys., Inc.*, 554 F.3d 426, 437 (3d Cir. 2009).

[122] *Id.*

[123] *Id.*

[124] *Id.*

[125] ECF Doc. No. 20, at p. 9.

[126] ECF Doc. No. 18 (App. DMSJ) at 44.

[127] *Id.* at 54.

[128] *Id.* at 49.

[129] *Sampson*, 88 F. Supp. 3d at 438 (finding record of six months of pain and a five-month absence for surgery and recuperation insufficient to establish a record of impairment).

[130] 29 C.F.R. § 1630.2(l).

[131] *Gavurnik v. Home Properties, L.P.*, 227 F. Supp. 3d 410, 419 (E.D. Pa. 2017), *aff'd*, 712 F. App'x 170 (3d Cir. 2017).

[132] *Id.* at 420.

[133] *Id.*

[134] *Id.* at 419-20.

[135] ECF Doc. No. 19, at p. 14.

[136] ECF Doc. No. 20, at p. 14.

[137] ECF Doc. No. 19, at pp. 17-18.

[138] *Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC*, 58 F. Supp. 3d 446, 466 (M.D. Pa. 2014) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

[139] *Fuentes*, 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)) (internal citations omitted).

[140] *Maiorini v. Farmers Ins. Exch.*, No. 14-1613, 2017 WL 1177172, at *33 (E.D. Pa. Mar. 30, 2017) (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).

[141] *Keller*, 130 F.3d at 1108 (quoting *Fuentes*, 32 F.3d at 765).

[142] *Proudfoot v. Arnold Logistics, LLC*, 59 F. Supp. 3d 697, 708 (M.D. Pa. 2014), *aff'd*, No. 14-4703, 2015 WL 5881530 (3d Cir. Oct. 8, 2015).

[143] ECF Doc. No. 20, at p. 14.

[144] ECF Doc. No. 18 (App. DMSJ) at 11.

[145] *Id.* at 9.

[146] *Id.* at 97.

[147] ECF Doc. No. 20-2 (App. DMSJ) at 295.

[148] *Id.* at 294.

[149] *Id.*

[150] *Id.*

[151] *Id.* at 298-99.

[152] ECF Doc. No. 18 (App. DMSJ) at 111.

[153] ECF Doc. No. 20-2 (App. DMSJ) at 299-300.

[154] *Id.* at 300-01.

[155] *Id.* at 282.

[156] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 130.

[157] *Id.* at ¶ 143-55.

[158] ECF Doc. No. 20, at p. 13.

[159] ECF Doc. No. 18 (App. DMSJ) at 197, 199.

[160] *Id.* at 11.

[161] *Id.* at 10.

[162] *Id.* at 97.

[163] While Mr. Parrotta argues pretext because PECO did not immediately terminate him, he seems to misread the policy. He argues although the policy provides "[f]or exempt employees, the first positive drug test will result in termination," PECO waited 107 days to terminate him. But this provision does not mandate immediate termination. In fact, PECO provided for immediate termination in certain instances: "Employees will be immediately terminated for the following conduct: the refusal to take a test or failing to show up for a test without a reasonable and substantiated explanation, as determined in management's discretion; providing a false or tampered sample; or otherwise willfully attempting to subvert the testing process." Neither party offers evidence or argues Mr. Parrotta committed one of these violations.

[164] *Russell v. Vanguard Grp.*, No. 04-3269, 2006 WL 2077010, at *3 (E.D. Pa. July 24, 2006) (finding the exercise of discretion in making a recommendation for promotion insufficient to show pretext).

[165] *Gupta v. Sears, Roebuck & Co.*, No. 07-243, 2009 WL 890585, at *18 (W.D. Pa. Mar. 26, 2009) (finding pretext when plaintiff showed employer used discretion to treat employees outside the protected class more favorably than she for similar violations).

[166] *Santiago v. Brooks Range Contract Servs., Inc.*, No. 11-7269, 2014 WL 4930918, at *11 (E.D. Pa. Sept. 30, 2014), *aff'd*, 618 F. App'x 52 (3d Cir. 2015); *see also Hodczak v. Latrobe Specialty Steel Co.*, 761 F. Supp. 2d 261, 278 (W.D. Pa. 2010), *aff'd*, 451 F. App'x 238 (3d Cir. 2011) (declining to find pretext when plaintiff argued defendant's investigation "was not extensive enough"); *Showers*, 58 F. Supp. 3d at 467 ("An employee cannot discredit an employment decision solely by showing that the employer did not review all information potentially relevant to that decision, so long as the employer's decision was nondiscriminatory and made in good faith.").

[167] ECF Doc. No. 18 (App. DMSJ) at 11; ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 12.

[168] *Cullison v. Dauphin Cty., PA*, No. 10-705, 2012 WL 3027776, at *17 (M.D. Pa. May 18, 2012) ("[A] failure to follow an internal disciplinary procedures does not suggest either a discriminatory intent or pretext, absent evidence of similarly-situated individuals who were treated differently with respect to such policies.").

[169] *Maiorini v. Farmers Ins. Exch.*, No. 14-1613, 2017 WL 1177172, at *33 (E.D. Pa. Mar. 30, 2017) (quoting *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997)).

[170] ECF Doc. No. 20, at p. 14.

[171] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 74.

[172] ECF Doc. No. 18 (App. DMSJ) at 98 (showing Mr. Parrotta began a medical absence on 5/19/17 covered by "personal sick/FMLA" for the first five days of absence, thereafter "STD/FMLA").

[173] Like his disability discrimination claims, our holding on Mr. Parrotta's retaliation claim under the Disabilities Act applies to his retaliation claim under Pennsylvania law. *Gardner v. Sch. Dist. of Philadelphia*, 636 F. App'x 79, 85 (3d Cir. 2015).

[174] 42 U.S.C. § 12203(a).

[175] *Wells v. Retinovitreous Assocs., Ltd.*, No. 15-5675, 2016 WL 3405457, at \*2 (E.D. Pa. June 21, 2016), *aff'd*, 702 F. App'x 33 (3d Cir. 2017) (citing *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F. 3d 245, 256 (3d Cir. 2014)) ("Plaintiff's retaliation claims under the FMLA, ADA, and PHRA are all analyzed under the *McDonnell Douglas* burden-shifting framework.").

[176] *Mills*, 869 F. Supp. 2d at 626 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)).

[177] *Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 705 (W.D. Pa. 2014) (quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[178] ECF Doc. No. 18 (App. DMSJ) at 257-61.

[179] ECF Doc. No. 20-1 (Parrotta SUMF) ¶ 63.

[180] *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761 (3d Cir. 2004).

[181] 29 C.F.R. § 825.220(c).

[182] *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 151 (3d Cir. 2017).

[183] *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (citing *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009)).

[184] *Id.* at 303.

[185] *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146 (3d Cir. 2004).

[186] *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009).

[187] *Id.*

[188] *Id.* at 509.

[189] *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847 F.3d 144 (3d Cir. 2017) (citing *Abramson v. Wm. Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001)).

[190] *Williams*, 380 F.3d at 759 (termination occurring two months after request not "unusually suggestive").

[191] *Id.* (termination occurring two months after request not "unusually suggestive").

[192] ECF Doc. No. 9 (Rule 26 Report, Stipulated Facts), at p. 3 ¶ 2.f.

[193] ECF Doc. No. 18 (App. DMSJ) at 257-61.

[194] ECF Doc. No. 20, at p. 16.

[195] *Bloom v. Indep. Blue Cross*, 340 F. Supp. 3d 516, 525 (E.D. Pa. 2018) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")); *Markowitz v. Ne. Land Co.*, 906 F.2d 100, 106 (3d Cir. 1990) ("[T]he rule within this Circuit is that once all claims with an independent basis of federal jurisdiction have been dismissed the case no longer belongs in federal court.").

[196] *Bloom*, 340 F. Supp. 3d at 525.

[197] ECF Doc. No. 1 (Complaint) ¶¶ 6-7.